Good morning and seated please. I'm happy to have you here this morning. It's going to be a short but interesting night. Please try to pay attention to our traffic signals. When the yellow light comes on, you have two minutes. When the green light comes on, we ask you to conclude your remarks unless you're answering a question from the bed. And please also, I know you're all experienced too, give us record citations as those are appropriate. The first case this morning is number 221584, U.S. v. Hinojosa, process and wording. Good morning, lawyers. My name is Ashley Kieber and I'm here representing Alfredo Hinojosa. Today I will discuss the erroneous admission of Josephine Hinojosa's arrest and conviction and the insufficiency of the evidence to make a finding on the drug homicide. Turning first, what we refer to as the Josephine evidence. The lower court committed reversible error by admitting evidence that Josephine Hinojosa, Alfredo Hinojosa's niece and bookkeeper, that she was convicted of transporting 14 kilograms of cocaine. This evidence was entirely irrelevant for three primary reasons. The first is that Josephine's conviction for transporting interstate a large quantity of cocaine had no connection to the sale of personally used quantities of cocaine that were sold in the bathrooms of Mr. Hinojosa's nightclubs. Second, her arrest occurred after the conspiracy theory ended. And third, it took place in an entirely different state. The government concedes that this issue was preserved. The only reason the government introduced this evidence was to prejudice the jury and convince them that by association, Mr. Hinojosa was a large-scale drug trafficker. This court has long condemned this type of guilt by association as it encourages speculation. And this court has repeatedly characterized guilt by association as highly prejudicial. Admission of this evidence was particularly bad here because it was the only evidence that suggested that Mr. Hinojosa personally engaged in drug trafficking instead of turning his head while drug dealers sold personally used quantities in the bathrooms of his nightclubs. Well, that's not quite right. I mean, he did, after all, encourage his lieutenants to allow it to keep going. So he was convicted of possession with intent, right? He was convicted of possession with intent. And our belief is that he was erroneously convicted on that count because the jury was influenced by Josephine Hinojosa's conviction. It's that he personally engaged. You said it was the only evidence he personally engaged instead of turning the door knocked by that. I don't understand how this is even evidence that he personally engaged. It's evidence that he personally engaged because the government introduced evidence that when Josephine Hinojosa was arrested in the car transporting the cocaine, she was also found in possession of books and records that had to do with the nightclub. And the government argued that Josephine was a co-conspirator, which is why her testimony of her arrest should be introduced at trial. And that was an implicit connection indicating that she, in her role as a bookkeeper, was transporting the cocaine. And it's our position that that influenced the jury to believe that Alfredo was directing her to do so. Did they argue that in closing? Is that supported in the charge? In closing, Josephine was mentioned two times. And while the government says that those mentions were in passing, there were still two references to Josephine's conviction, both when discussing the amount of drugs that were found, well, in one instance, when discussing the amount of drugs that were found to have occurred in this case, and second, when saying that these three individuals, Mr. Casas, Mr. Rodriguez, and Mr. Hinojosa, had no problem letting other co-conspirators get arrested for similar offenses. So, to go back to, it is the government's work to prove that this error was harmless, and they have not done that. The evidence unfairly suggested that Mr. Hinojosa had the men's rate of drug trafficking, and this was necessary for a conviction on count 25. Whereas, the jury might well have had a reasonable doubt about this based on the evidence. Also, the government can not show that evidence of Josephine's conviction did not prejudice the jury. I'd like to briefly address my second point, which is the drug quantity, and that it was mispopulated. Here, there was insufficient evidence of more than 5 kilograms of cocaine, so the conviction should be reduced from an E1A to an E1B, and this case should be remanded for resentencing. Let me ask you, did the, was there, there was a contemporary objection to the Josephine evidence, right? Yes, Your Honor. And did the court give limiting instruction? I do not believe so. Well, they, from what I understand, at some point the court gave an instruction that you don't import evidence about one defendant to another one or something like that. That is correct, Your Honor. There were final jury instructions before the jury. Is there anything else you had to say about the objection? At the time that the objection was made, the judge had a question about the relevance when the Revenge Conference was held. At that time, Mr. Lewis, who was representing Mr. Pina Costa, argued about the relevance of Josephine's admission, and so the court had a question as to the timing in the indictment and to the time that the arrest of Josephine occurred. At that time, the government said that the period of the indictment went beyond the time in which Josephine was arrested. Well, that's not my question. My question is whether, so obviously the judge laid in the evidence, but at that time, was he asked to give a limiting instruction? No, Your Honor. That's all I know. Thank you. But I'll just ask one quick question, please. The ineffective—well, I want to start with it. Pina Costa urges a limited remand in district court regarding ineffective assistance of counsel. Why would this be so unique or special that it goes outside what we normally do, an IEC claim on direct appeal? Of course, that's without prejudice if it's denied, and you do it later with a 2255. So why would we have a limited remand, I suppose, before we decide this case? Your Honor, we believe that in this instance, because Mr. Pina Costa had already signed a plea agreement with one set of counsel and then acquired new counsel and immediately withdrew that plea agreement, that there is a unique line of questioning that should go into the effectiveness of his assistance of counsel at that time. But no effect on the trial? Correct. Other than ineffective counsel? That's correct, Your Honor. Thank you. Good morning. May it please the Court, my name is Camille Knight, and I represent Martín Salvador Rodriguez. To pick up on the Court's questions from the last argument, this case really is an example of why a court of courts should not completely abdicate their responsibility to review jury verdicts. With regard to the conspiracy counts, Excuse me, what did you say? Your Honor, will you pull back on the mic, please? Yes, I'm sorry. Are you saying you completely abdicate your responsibility? No, no, no. This is an example of why courts of appeals should not abdicate their responsibility. I thought you were just lobbying for that. No. That was your argument in the case, so perhaps we can move on. I think I did a good job. I was like that judge. In the conspiracy counts, the reason why the piling of interests upon interests becomes important to all of the defendants, and particularly Mr. Rodriguez, is because the government needed to prove three things. Knowledge, participation, and agreement. Now Liz, you're talking about the count of 20? 20 and 25, Your Honor. 20 and 25. Yes. Now, the government will certainly point to some tiny issues about that period and the co-relation of circumstances that could, at some point, evidence someone's consciousness of guilt. And without conceding those, I would point the court to record evidence that the main drug dealer in this case testified that there was no understanding with management about drug sales in the bathrooms between 2012 and 2015. There were no conversations about drug sales in the bathrooms, and in fact, the government pointed out to the district court that the Title III intercepts of the drug dealer's phone calls were not particularly interesting because the drug dealers did not talk to management and did not talk about management. So, as the co-location of circumstances may have come up, we contend that Mr. Rodriguez, there was no proof that Mr. Rodriguez joined in any conspiracy prior to 2015. Some witnesses say 2014 or 2015, and there are three particular instances that the government may point to that it's important to see the timing of those. First is, in the spring of 2015, Mr. Rodriguez was being followed. He called the Cock Truth Informant in area. There were discussions after that, and it became clear that the FBI was investigating drug dealing at the clubs. That happened in April 2015. The second instance that the government may point to is a period of time after drug sales had stopped, and then it resumed after a number of months, and Mr. Rodriguez told someone at the clubs to please allow his guys from the Gucci to come back in, and that person took it to mean that he wanted people doing bad things to go back into the clubs. That happened in 2016. And the third was an instance in which a paid informant saw Mr. Rodriguez have a conversation, the content of which is unknown, with someone at a wash line as he washed his hands and left. That also happened in 2016. The import of that is that given the government's map that it pitches to the jury about drug quantities, it's impossible to get to five kilos unless you go back to 2013. We contend that it's improper to go back to 2013, and the only way a jury could have gotten to the drug amount was to use the 14 kilograms of coke taken from Josephine Hinojosa months after the last substantive buy at the clubs. Her arrest was in February 2017. The last substantive buy was in October 2016. And finally, was there a chart or something of the trials and the government that gave the analysis of the cocaine? Yes, Your Honor. There was a chart, and I can write that and send it for you in rebuttal. The total weight of all the undercover buys without packaging was 20.8 grams. I think that record size is 82, 18 to 19. And it's important to note that the jury here did not reach verdicts on any of the substantive counts prior to 2016. The only substantive verdict they reached for any of the defendants was October 2016. And the title of conspiracy alleged in the indictment is much broader, but the jury obviously thought that those substantive offenses were not proven. Thank you, Your Honors. All right. Thank you very much. Ms. Bacchus, would you come up? Yes. And may I please record? I'm Shirley Robel here to represent Mr. Casas in the case where he was convicted of three of the 17 counts with which he was charged, two of which are conspiracies. The first is a conspiracy to violate the 856 statute, which, of course, the court is aware of. The leading case in this circuit is the Chen decision. And then the other conspiracy is Count 25, where essentially, as the gentleman argued during the trial, the drug buys that occurred during the course of the almost three and a half years periodically were used to support not only 856, but extrapolated to support Count 25. If you can judge the argument about how to properly interpret 856A2 from the jury, do you still intend that there's insufficient evidence for Counts 19 and 20, even via the conscious decision to do or allow the drug sales in the clubs? Judge, I'm wrong. We do. And we have so far on that in our agreement. Even if you apply this very strict, and we have asserted and believe constitutionally vulnerable interpretation of 856, given the Chen decision, even if that were to occur, then yes, because at a very minimum, it is not just being there that counts. And if you examine the briefs set forth with facts that are produced by the government of this trial, in some detail, and respectfully, everything is consistent with something one of the agents remarks upon during the testimony, which is, here's Mr. Casas specifying what one of the persons who are selling these quantities in the bathroom says, don't let Casas see you selling drugs. And then as late as December of 2015, he is still instructing Rendon to stay on the bathrooms at the club and to make sure that that is occurring, and that is consistent with his behavior. That is a different question entirely, whether or not there was knowledge of what was going on. And to be more pointed, Judge O'Rourke, in response to your question, there's absolutely no evidence whatsoever that Mr. Casas is ever instructing anyone to allow these sales in the bathroom. And yes, we do believe the evidence is insufficient. On the question that co-counsel have raised regarding Josephine Pinojosa, in addition to the question we have raised and has been adopted by the other appellants of this business of let's redefine money laundering with the next word witness, both of these pieces of evidence do not pass the relevancy test. What kind of creature is the evidence about Josephine Pinojosa? Mr. Casas' counsel did what he could. He sought to find out anything and everything about 404B. Is that what it is? There's certainly no room whatsoever that Josephine Pinojosa was a co-conspirator. It's just something that is procedurally inappropriate to throw something in an indictment. In both of those instances that we've signed where you do not have the ability to challenge them and interdict it and keep the judge out of the operation. I believe we're done, so thank you so much. Thank you. Thank you very much. Yes, thank you. May it please the Court. Jeffrey Wertheimer, Captain of the United States. Now, I'll address all of the arguments that the defendants raised, and the rest of the issues will rest on our briefs with that. Regarding the first issue that Casas raised about the sufficiency of the evidence in supporting his convictions on Count 19 and Count 20, which are the managing a drug crisis counts, the conspiracy and the substantive count, we argue that the issue would be governed by plain error because he raised specific grounds for his Rule 29 motion in the district court that were separate from those grounds he was raising them on for the first time, which is that there was insufficient evidence of the act as serious. There is more than enough evidence to support that there was evidence of the act as serious, that is, that he made the place available for drug dealers to use. Who are you talking about? Casas. His argument otherwise is that a lack of evidence made it available, that he said let them come into the bathrooms and sell drugs, or that he was on the table with them, or that he somehow benefited from doing the drugs rather than to the contrary, that the evidence was people didn't want him to see that they were selling drugs. Well, the making a place available includes failing to approve the drug to others. So it's the flip side of the same coin. If you're allowing drug dealers to enter and allowing them to stay, you're also failing to remove them and failing to deny them entry. But you mean that there's evidence that at a certain time period he wanted them gone? Well, the evidence is that he knew from before 2013 that they were regularly doing this in the clubs, that we have repeat players coming in every weekend from that way after the point that he knew and selling drugs and it's happening, letting it happen. We also have intercepted a phone call from March 25, 2015, where Quino Jose states that he's marching in the University of Casa to be a little flex, was a drug dealer's deal, once in a while clean it up. And so the evidence is that they are continually selling in the clubs. The only break comes when Quino Jose is worried about the FBI investigating him after the March 2015 break. At that point, he says, okay, let's tighten up the clubs. So they go on hiatus for a little bit. But once their business suffers because they're no longer allowing cocaine sales in the clubs, then they decide, okay, let's let them back out. Let's try to get a little more restraint on it. So... Yes, he's in charge of all the employees. And so if you have a process of action, a consistent response to the drug dealers that the clubs are doing, and he's in charge of the employees, it's a fair effect that he's allowing. In addition to that, I have testimony that people saw him talking to the main dealer in the clubs that told the security guard that you could keep a payment that a drug dealer gave you. And then when, after the drug deal hiatus, or the drug sale hiatus, he advocated in that management decision to let the drug dealers back out because business was suffering. Okay, what about the conspiracy with Josephine and also the amount of drugs? Okay, so turning to that issue. The district court did not substantially use its discretion in finding that testimony was relevant because it proved up... What was relevant? I can't hear you. The testimony, sorry. The testimony regarding the Josephine traffic stop, because it proved up a specific allegation in the indictment. What did it prove up in the indictment? It has to do with the defendant. So the government viewed this as another instance during the relevance record with the conspiracy where Josephine is entangling his business with drug trafficking. And so it alleged a specific traffic stop in the indictment. It has to do with his business. It's her side deal, right? It's done not with the club at all. That's right, it wasn't the club. But it's a fair inference that his business was involved because she's taking a long distance trip with a large amount of kilograms of cocaine and it was brought to the books of the company. His books of what? The fact that she works there is the only evidence she had and materials that belonged to the company because she also works there. The inference that she brought those books because she needed them while she was transporting those large kilograms of cocaine. She's going to do a legitimate job while she's on the trip for drug dealing. She's going to do a legitimate job while she's on the drug dealing. Right. And the events that are tied to the company for the drug dealing. Well, the defense definitely argued that it was just a coincidence that she had that. But if the jury agreed with the government that it was reasonable to infer that she's gone for cash with his businesses, then it would be relevant. Did they pay for her trip? Was there evidence that they bought her airline tickets or gas bills or something? Was there something on this as a business trip that would tie it to business? There was no evidence of that, Judge Carter. It was just the inference would arise from the fact that she brought them with her and that they were in close proximity to drugs. She brought them because she needed them. She didn't say anything about her drug dealings, right? She said, oh, page 23 of the books of the company booklets is drug dealing. That was the case. These books have nothing to do with her drug dealing, right? With her drug dealing for that? Yes, her 14 kilos, yes. I mean, we are convinced that she wasn't brought unless she needed them. These books don't detail. That's right. They only tell us in this day. Her drug dealing. That's right. They only tell us in this day and that's not filed. This is a drug deal. 14 kilos for this amount. It doesn't say that. And if it's in there, it's not going to be enough to correct. But even if this court thinks that it's fair for the court to find that to be relevant, it was clearly harmless. The evidence against Hinojosa was just overwhelming. You have controlled vibes, you have co-conspirator testimony, recorded, and much of it was Hinojosa's own words in intercepted phone calls and recorded statements where he says, customers complain. So, I got a little more blunt. I was worried about that. So, that's where I tightened it up. Well, let me ask you a question. How much did the Justine testimony, what role did it play in receiving the entire trial? It was a very small part of the trial. From what I remember, it was 19 pages from over 3,600 pages. Only one defendant objected. Only one defendant objected, that's right. And they didn't ask for a limiting instruction. They did not. And the court, in its general instructions, gave the instructor, the jury, that you can't have someone guilty merely by dispossession. Can you talk about the quantities? I had asked about the quantities against Justine. So, that evidence supporting the five-kilogram quantity? Yes. What do you bring towards five kilograms separate and apart from her drug quantity? So, the defendants' arguments for insufficiency here all rely on when the defendants joined the conspiracy. And here, there was ample evidence that Kunihosa joined the conspiracy before, at least by 2011-12. And that the security guard directly testified that drug dealers were openly selling drugs as far back as 2009. And when he told his supervisors about it, they told him to leave it alone. Then you have drug dealer Mendoza Martinez who testified that Ron Lord, the main distributor at Kunihosa's Dallas Clubs, was distributing it at Far West as far back as 2008. And then Lord testified that by 2012, he was regularly distributing in the Dallas Clubs, either himself or through his workers. So, when is the relevant time period according to the government for each of the three defendants that we're talking about today? When is the relevant time period? Kunihosa says it's 2012. Yes. So, when is their time period? So, the evidence shows that they joined the conspiracy at least by 2012. All of them in 2012? Yes. Because you believe it's 2012 is the relevant date for each of these defendants. Yes. And from 2000, you go from 2012 forward, is there evidence as a record of 5 kilos how you get there? In my sense, there's no sort of chart you show the jury or something. There, in our community, outlined on that. But even more genuinely, we would generously think that even if they only started in 2013, that would be 160 weeks and times the 50 grams undisputed per week that gets you at 8,000 kilos. I'm asking those arguing to the jury about this so that we can make sure that the jury wasn't confused by the 14 kilograms. So, I'm not asking what's in the math for us today. I'm asking what did the jury have to help them do the math? Or if they could have done the math on their own in the jury room, what evidence is in the record for the jury from which they could calculate 5 kilograms? So, when the government was arguing the findings and voting, they had a chart coming with the math calculated. And it was, they had it at 208 weeks. Was it time period? Yes, it was. How much per week? At trial, they were arguing a conservative amount of 30 grams per week. 30 grams? Yeah. But on appeal, the defendants were not disputing it was 50 grams per week, which was used as their thing. Okay. And his testimony, it was 30 grams per week or 50 grams per week, whichever one. Yes. Which, whose testimony? So, there was a lawyer's testimony about what he personally distributed in the class. And then there was his worker's testimony about what they personally distributed. And then, I think they took the conservative of just one person was 150 when they used at trial. And then at sentencing, they used the conservative, like the midpoint of what multiple dealers were doing, which was 250 bags per week, which was the 50 grams. So, a lot over 5 kilograms. Yes. The point is that there's so many different ways that you can do the math and still get over 5 kilograms. Even if you're very generous on, okay, let's say that they did less bags per week. Even if you're more generous on, let's say, okay, they didn't start until 2013. There's many different ways to calculate it and you still get to 5 kilograms. And if the court has no further questions, we'll press. Can you believe there's any reason that we should take up the insubstantial? I mean, the lawyer being, like, not a lawyer, allegedly. At this stage, would it have been an unlawful process? No. I think under this court's precedent, the practice is clearly, if you can't decide it on the basis of the record before you, then you dismiss it without prejudice to them raising the claims in 2255. Well, just explain how 10, 19, and 25 do not overlap a great deal. How they overlap? How they do yet do not overlap. In other words, they do seem pretty redundant. Yes. In most managing a drug premises cases under subsection 82, you don't need purpose. You don't need the defendant to join in the purpose of the drug dealer and their value on their property. Because in this case, the facts were that these defendants did join in that purpose. That's what makes them liable for a drug conspiracy as well. So contrary to what Kena would have argued, not every subsection 856-82 defendant is going to also engage in a conspiracy. It's only in those unique cases where the defendant joins in the purpose of the drug dealer that they're allowing them to their property. And here you have the evidence. Kena's closest and his management team's interests were perfectly aligned with the drug dealers. They wanted them to deal on their clubs because it made the customers happy and increased their business. Can you talk about the money laundering expert? Why was that completely irrelevant and prejudicial? The money laundering expert, that's what I mean. The district court didn't abuse its discretion in finding it relevant because it was relevant to Chapter 21. Was it objected to timely by all the defendants? Yes, it was objected to. Kena was the one who gave the most robust objection to it and then constantly continued with that. I mean, because you can say – you can present obstruction and explain what obstruction is to avoid bank accountability without talking about, oh, I'm going to launder this money and do this other business, et cetera. You could have very easily done – tailored the testimony to the actual charge rather than expanding it so much to totally uncharged crimes that are very prejudicial. To prove – I mean, much of this dispute was his intent. Did he knowingly, intentionally cause the bank to file false reports? And did he do it with the purpose of evading the reporting requirements? So if he, as a member of the entire society, is engaged in practices that are consistent with money laundering, then that makes it much more likely that, yes, he was purposely trying to avoid the reporting requirements and he did intentionally and knowingly file false – cause the bank to file false reports because he was trying to hide the true sources of funds. So it tended to prove a fact that it was reported, which would then disappear for Chapter 21. Basically, Kena knows his intent. Do you have a case that says that's okay? A case – That would say that even if it is very prejudicial, that with other crimes that are not undided, then it's appropriate to do that. It would mostly be the cases, I guess, of all that and the buyers. I mean, it would be cases really emphasizing the rule that the district court has discretion to decide whether it's relevant here or whether it's relevant under the rule because it had a tendency to prove a fact of consequence. And then the district court didn't air its discretion in finding that it wasn't unduly, unfairly prejudicial because it involved a cold, non-implementary analysis of banking tax records, not something likely to invoke the emotions of the jury. Defense counsel had ample opportunity to expose any weaknesses in his testimony by calling their own expert witnesses and prosecuting him. Counsel repeatedly emphasized to the jury that the defendants were not convicted – I mean, not charged with money laundering. And the jury instructions cautioned the jury, you know, consider only the charges that they were charged with, not anything else. So there was lots of things in the record to prevent the kind of prejudice that the defendants were arguing, and the district court didn't air in finding that that deprobative value was not substantially outweighed. But even if the court disagrees, the admission of the testimony was not – was harmless, especially with regards to the only defendant disputing here, which is Casas. Because Casas counsel emphasized in closing that Eric Lee's testimony had nothing to do with his client. The government didn't argue otherwise. They never argued it had anything to do with Casas. And there was overwhelming evidence of Casas' guilt. So even if the court finds that it was error to admit Eric Lee's testimony, it was harmless. And if the court has no further questions, I will respond to briefs and ask the court to affirm. I'm sorry. Could you talk about the criminalized group in violation of the – Sure. Of course. All right. So the statement that the defendants, Casas and Rodriguez, complained about is that Kenab Rosa said that it could have been the manager or the promotions guy that brought the customer complaints to him. Now, on its face, that statement does not directly implicate Casas or Rodriguez. It does not refer them to him by name or some unique physical description. It doesn't replace the proper name with an obvious blank. And under the Supreme Court's recent decision in Samia, that resolves the issue. The statement does not directly implicate Casas and Rodriguez. Notably, Samia holds that remains true even where other trial evidence indicated that Samia was the other person involved in his co-defendant's statement. Under Samia, the court will not apply spec or scrutinize the trial record for evidence that could give rise to an inference that the statement is referring to the defendants. But even if the court were to scrutinize the record and see if there's any evidence that could give rise to Kenab Rosa implicating them, even when linked with other record evidence, his reference to the manager or the promotions guy could have referred to a number of individuals because there were multiple managers and promoters at the club. And even under the unredacted statement of Kenab Rosa, it does not clearly report a point of data that Casas or Rodriguez, because he specifically stated that it could be Neboa, a promoter, or it could be any one of the managers who related the complaint to him. Moreover, it's important to look at all the inferences that are required before that statement even becomes illuminatory towards Casas or Rodriguez. You have to infer that the manager or the promotions guy referred to Casas or Rodriguez. You have to infer that when Kenab Rosa said it could be the manager or the promotions guy, that despite sounding equivocal, he was actually confidently pointing the finger at them. And then you have to infer that Casas and Rodriguez relayed those complaints to Kenab Rosa because they wanted him to allow drug stamps in the club. And then you have to infer that there was a clear agreement to allow drug sales in the club and that Casas or Rodriguez later joined in that agreement. So there's so many inferences you have to make based on so much more linking evidence before the statement even becomes incriminatory. The district court did not find evidence and indirectly implicate them. Okay. Thank you. All right. Each of you ladies have a minute or two to rebut. Okay. One minute. There are not many ways to arrive at over five kilograms of cocaine. There are two ways to arrive at the person is by arguing that Mr. Kenab Rosa did do the conspiracy in 2012. There is no evidence of that. The government references two witnesses in support of that assertion, both of whom say that there were managers and promoters that were aware of drugs sales happening as early as 2012. There's no evidence that Mr. Kenab Rosa was present for those conversations, that he was informed of those conversations, or that he had any knowledge of drugs that was occurring prior to July of 2014. The second way that the government can assert that there was over five kilograms of cocaine is by reference to Josephine Kenab Rosa's 14 kilograms. And our position is, as Judge Elrod was fine-tuning for some of your questioning, this was completely unrelated. There's no evidence that was presented at trial that Josephine's transportation of 14 kilograms had anything to do with the drug sales that were happening at the clubs. Thank you. All right. Thank you. Ms. Knight. Thank you, Your Honor. In terms of the timing, I wanted to point the court to record sites about Rodriguez's knowledge or the time when it could be inferred that he had entered any agreement. The main drug dealer, Juan Lara, in this case, that's where his figures are where the government's map largely stems from, he testified that there was no agreement between him and anyone in management between 2012 and 2015. And that's at records 4120 to 4121. The people who testified about Rodriguez's knowledge of drug sales, Mr. Rendon put it at 2014 or 2015, and that's records 1718 to 21 and 2544 to 46. Mr. Neboa testified about it being 2016. That's record 8227. And Mr. Villarreal and Mr. Neboa both referenced March on April 2015. That's record 3442 to 44, 4578 to 81. And Mr. Rodriguez's interview by the FBI was in 2016. That's at record 4286 to 87. As to Judge Elrod's question about whether the government mentioned Josephine's cocaine in closing, it did. In both closing and rebuttal, the government emphasized that those 14 kilograms of cocaine, that's at records 6439 and 6561. I'll let you have the rest of my time, Your Honor. All right. Thank you. Your Honor, first I'd like to address the one point of remark against Mr. Casas that was made by counsel from the prosecution of Capelli. That was a record reference to the testimony of Juan Julio. And Juan Julio, I don't know that he has any great significance anyway. Juan Julio saying, oh, some drug dealer gave me some money and said just keep it. I do know that Mr. Casas, as the record shows, was the individual who fired Juan Julio when it was discovered that he was accepting money from drug dealers to evade detection by those who were interested in controlling that. The second thing I want to say again about Mr. Casas is I want to refer the Court to the brief where we discussed the incidents at Medusa. Mr. Hinojosa was sending mixed signals, and it is very clear from that incident where Mr. Casas cannot, with the help of the others, find out why there was a perpetual odor of marijuana at Medusa. But ultimately they discover, and he reports it, that they are grinding out the cigars and putting marijuana in the cigars, and they saw them that way. And that is consistent with everything that actually is an act that Mr. Casas did. I also want to, in addition to that, in that conversation, Mr. Hinojosa, if I may complete my sentence, says to Mr. Casas, sometimes we just have to, Mike, we just have to live with the fact that being aggressive in the clubs will reduce attendance. Thank you. All right. Thank you very much.